United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DIVERSIFIED RESTAURANT GROUP, LLC, et al.,

Plaintiffs,

v.

HOUSTON CASUALTY COMPANY, et al.,

Defendants.

Case No. 25-cv-02344-EMC

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

Docket No. 49

## I. INTRODUCTION

This is the latest installment in an ongoing insurance coverage dispute. Plaintiffs Diversified Restaurant Group ("DRG"), LLC, and Golden Gate Bell ("GGB"), LLC, both California limited liability companies who own and/or operate restaurants, filed suit against Defendants Houston Casualty Company ("HCC"), Pennsylvania Manufacturers Indemnity Company ("PMIC") and Manufacturer's Alliance Insurance Company ("MAIC") seeking insurance coverage for the defense of an underlying lawsuit. Plaintiffs (herein "Insureds") have been sued for sexual harassment by a former employee ("Underlying Action")[1]. The Court previously granted motions to dismiss filed by PMIC and MAIC. Dkt. No. 32. HCC is the only defendant left in the case.

HCC provides Employment Practices Liability ("EPL") insurance to the Insureds, which provides coverage for claims involving sexual discrimination and harassment, retaliation, and

[1] The complaint of the Underlying Action, found at Docket No. 26, Exhibit A, was filed in the Superior Court for the State of California, Case No. C23-00634, entitled *Jane Doe v. Golden Gate Bell, LLC*. The Court takes judicial notice of the Underlying Action pursuant to Evidence Code section 452, subdivision (d).

United States District Court
Northern District of California

inappropriate workplace conduct. HCC issued EPL policies to the Insureds for 2022 and 2023 under identical terms. Both policies were "claims made and reported" policies, applying only to claims that were both made against an Insured during the policy period by a claimant and reported to HCC by the Insured within 30 days after the end of the policy period.

In December 2022, the Insureds received a letter from counsel for the former employee, plaintiff in the Underlying Action. The letter related to the alleged sexual harassment that forms the basis of the Underlying Action. The central question on summary judgment is whether that letter was a "claim" within the meaning of the EPL policy such that the Insureds were required to report it to HCC within 30 days after the 2022 policy expired, or by January 30, 2023. If it was a "claim" within the meaning of the policy, the Insureds failed to report it to HCC within the prescribed time frame. For the reasons below, the Court holds that the letter was a claim. HCC's Motion for Summary Judgment is **GRANTED**.

## II. BACKGROUND

### A. Procedural History

The Insureds initiated this suit on January 22, 2025. In March 2025, the case was removed from Contra Costa County Superior Court. Dkt. No. 1. On May 15, 2025, Defendants PMIC and MAIC filed a motion to dismiss, which this Court granted on July 31, 2025. Dkt. Nos. 17, 32. HCC did not bring a motion to dismiss and was not party to the previously granted motion to dismiss. Instead, HCC filed an answer on June 11, 2025. This Court held a case management conference on August 26, 2025 during which the Court directed the parties to meet and confer to set a briefing schedule for cross-motions for summary judgment on HCC's claim of either no remaining coverage or failure to disclose. Dkt. No. 39. HCC's motion for summary judgment is now before the Court. Dkt. Nos. 48–49 ("Mot.").

### B. Factual Background

#### 1. HCC's Insurance Policy

The Insureds contracted with HCC for EPL insurance, which provides coverage for claims involving sexual discrimination and harassment, retaliation, and inappropriate workplace conduct. HCC issued EPL policies for 2022 (effective January 1, 2022 to January 1, 2023) and 2023

United States District Court
Northern District of California

(effective January 1, 2023 to January 1, 2024) under identical terms.

The policies are "claims made and reported" policies, which means that they only apply to claims that are both made against an insured during the relevant policy period and reported by the insured to HCC no later than 30 days after the end of the policy period. The introductory section of each policy states:

> **EMPLOYMENT PRACTICES LIABILITY INSURANCE**
> (Claims Made and Reported Coverage/
> Defense Costs Reduce the Limit of Liability)
> THIS IS A CLAIMS MADE AND REPORTED POLICY. THIS POLICY APPLIES ONLY TO CLAIMS FIRST MADE AGAINST AN INSURED DURING THE POLICY PERIOD OR ANY EXTENDED REPORTING PERIOD (IF APPLICABLE) AND REPORTED TO THE COMPANY IN WRITING PURSUANT TO THE TERMS AND CONDITIONS OF THIS POLICY. . . .

Mot. Ex. E at 41.

The policies then provide:

> **I. <u>INSURING AGREEMENTS</u>**
>
> In consideration of the payment of the premium and in reliance upon all statements made and information submitted with the Application, which is deemed attached hereto and made a part of this Policy, and subject to the Limit of Liability and Deductible as well as all terms, conditions, limitations and exclusions of this Policy, the Company and Named Insured agree as follows:
>
> **(A) Employment Practices Wrongful Act Coverage**
>
> The Company shall pay Loss and Defense Costs, in excess of the Deductible and subject to this Policy's Limit of Liability, that an Insured is legally obligated to pay as a result of a Claim made against an Insured for an Employment Practices Wrongful Act as long as: (1)the Claim is first made against an Insured during the Policy Period or Extended Reporting Period (if applicable), and reported to the Company in writing during the Policy Period or Extended Reporting Period (if applicable); (2) the Named Insured, Management Team, or Member had no knowledge of the facts or circumstances giving rise to the Claim prior to the Effective Date of the first Employment Practices Liability Insurance policy issued by the Company to the Named Insured and continuously renewed and maintained in effect to the Effective Date of this Policy; and (3) the Employment Practices Wrongful Act was committed after this Policy's Retroactive Date (if applicable).

*Id.* at 14.

"Employment Practices Wrongful Act" is defined in relevant part as:

> [O]ne or more of the following actual or alleged wrongful acts, errors, or omissions, by an Insured against an Employee, which directly results in an unlawful impairment of the terms and conditions of employment or continued employment:
>
> (2) "Harassment," which means unwelcome sexual or non-sexual advances, requests for favors, or other verbal, physical, or electronic conduct of a sexual or non-sexual nature that: (a) explicitly or implicitly is made a condition of employment; (b) is used as a basis for employment decisions; or (c) creates a work environment that interferes with performance.

*Id.* at 44.

> "Claim" is defined as:
>
> (1) a written demand made by or on behalf of a Claimant alleging damages;
> (2) a written complaint or petition for damages commencing a civil or administrative proceeding . . . by or on behalf of a Claimant; or
> (3) a written request submitted by or on behalf of a Claimant to a governmental agency seeking the commencement of a regulatory investigation of an Insured.
>
> A Claim will be deemed to have been first made when any Insured receives written notice of the Claim or becomes aware of the existence of the Claim.

*Id.* at 43.

"Circumstance" is defined as:

> [A]ny fact or event that may give rise to a Claim . . . against one or more Insureds, which is first discovered or learned by an Insured during the Policy Period, but which does not yet meet the definition of a Claim.

*Id.*

The policies impose a duty on the Insureds to provide notice of a claim as a condition precedent to any rights under the policies:

> **(A) Duty to Provide Notice of a Claim**
>
> (1) As a condition precedent to any rights under this Policy, an Insured shall give written notice of a Claim to the Company as soon as practicable, but no later than thirty (30) days after the end of the Policy Period or during any Extended Reporting Period (if applicable).
>
> (2) The notice shall be submitted as set forth in the Declarations of this Policy. The notice shall contain: (a) a copy of the Claim and any related documents; (b) the names of all Insureds allegedly involved in the Claim; (c) the identity of each Claimant or potential Claimant(s); (d) a description of

> the date, time, place, and circumstances giving rise to the Claim; and (e) the names of any witnesses who may have knowledge of the facts or circumstances giving rise to the Claim.

*Id.* at 51.

2. <u>The Potential "Claim"</u>

The Insureds own and/or operate several restaurants, including a Taco Bell in Antioch, California. On or about December 10, 2022, an underage employee at the Taco Bell reported an incident of alleged sexual misconduct to the restaurant's management. The restaurant's management informed the Insureds of the alleged sexual misconduct shortly thereafter, and the Insureds investigated the allegations.

On December 14, 2022, counsel for the employee, the Wilshire Law Firm, sent a letter to the Antioch Taco Bell (the "Wilshire Letter"). A copy of this letter is reprinted below. Enclosed with the letter was a blank form with spaces for the Insureds to provide insurance information, including a space for "Amount of Liability Coverage."

The letter arrived at the Taco Bell on or before December 20, 2022 and was forwarded to the Director of Risk Management for DRG that same day. The parties do not dispute that the Insureds knew that the letter referenced the alleged sexual misconduct, despite it only mentioning an "accident." The letter referred to the subject employee and the date and place of the incident.

United States District Court
Northern District of California

December 14, 2022

**SENT VIA US CERTIFIED MAIL NO. 9489 0090 0027 6396 1981 74**

Taco Bell
1706 A St
Antioch, CA 94509
Tel. 925-752-0105

**RE: Our Client : [redacted]**
**Date of Accident : December 10, 2022**
**Location : 1706 A St Antioch, CA 94509**

Dear Taco Bell:

This office represents the above referenced client in connection with the above referenced accident.

If you have insurance, please notify your insurance company immediately of this claim and have them contact this office. I would also appreciate your completing the enclosed form and returning it in the self-addressed, stamped envelope provided. If you do not have insurance, please check off the appropriate box and sign and date the form.

If we do not receive any kind of response from you or your insurance carrier within ten (10) days from the date of this letter, we shall take such steps as are necessary to protect the legal interests of our client. Please do not communicate with my client; kindly direct all communications to this office.

**Pursuant to §2695.7 [Standards for Prompt Fair and Equitable Settlements § (b)], upon receiving proof of claim, every insurer shall immediately, but in no event more than forty (40) calendar days later, accept or deny the claim in whole or in part, and affirm or deny liability.**

Please refrain from contacting our client, and refer all documents and correspondences to the attention of the undersigned. **ALL PAYMENTS made to any individual, or entity regarding this accident, including but not limited to bodily injury or med pay, must bear our name as co-payee as we do maintain a lien on this claim. This does not apply to property damage.**

**THIS IS A FORMAL REQUEST FOR IMMEDIATE WRITTEN DISCLOSURE OF YOUR INSURED'S POLICY LIMITS. Please submit, in writing, your insured's policy limits to my office immediately upon availability.**

I trust that you will give this matter your immediate attention.

Very truly yours,

**Angel Delgado**
**Case Manager to**
**Andrew Haling, Esq.**
**angeldelgadosteam@wilshirelawfirm.com**

AH/ jc

United States District Court
Northern District of California

**RE: Our Client : [redacted]**
**Date of Accident : December 10, 2022**
**Location : 1706 A St Antioch, CA 94509**

**Name of Insurance Company** : ______________________

Address : ______________________

Phone Number : ______________________

**Insurance Agent** : ______________________

Address : ______________________

Phone Number : ______________________

Policy Number : ______________________

Amount of Liability Coverage : ______________________

[ ] I DO HAVE LIABILITY INSURANCE TO COVER THIS ACCIDENT.

[ ] I DO NOT HAVE LIABILITY INSURANCE TO COVER THIS ACCIDENT.

DATE:____________ ______________________
SIGNATURE

______________________
PRINT NAME

Upon receiving the Wilshire Letter, the Insureds notified their general liability carrier and workers compensation carriers, PMIC and MAIC, but did not notify HCC. Insureds also retained external counsel to investigate the "accident" referenced in the letter. Insureds did not contact HCC about the "accident" or the letter until February 2023, after the deadline for the reporting date under the 2022 EPL policy.

## III. <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is

United States District Court
Northern District of California

genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.[2]

Where a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"The construction of a contract, unless it turns on disputed facts, is a question of law." *Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.*, 116 Cal. App. 4th 1375, 1388 (Cal. App. 2004).

## IV. DISCUSSION

The central question is whether the Wilshire Letter was a "claim" that the Insureds needed to report to HCC within 30 days of the end of the policy period. All parties agree that the letter was received by the Insureds no later than December 20, 2022, and all parties agree about the actual content of the letter. They disagree about whether the letter was a claim as defined by the policy.

### A. The Text of the Policy

We begin with the text of the policy. Under California law, "[i]nterpretation of an insurance policy is a question of law and follows the general rules of contract interpretation." *MacKinnon v. Truck Ins Exch.*, 31 Cal. 4th 635, 647 (2003), *as modified on denial of reh'g* (Sep. 17, 2003). "While insurance contracts have special features, they are still contracts to which the

[2] Evidence may be presented in a form that is not admissible at trial so long as it could ultimately be capable of being put in admissible form. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence"); *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 846 (9th Cir. 2004) ("Even the declarations that do contain hearsay are admissible for summary judgment purposes because they 'could be presented in an admissible form at trial'").

ordinary rules of contract interpretation apply." *Another Planet Ent., LLC v. Vigilant Ins. Co.*, 15 Cal. 5th 1106, 1135 (2024). Therefore, "the mutual intention of the parties at the time the contract is formed governs interpretation. If the policy language is clear and explicit, it governs." *Id.* "The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage,' controls judicial interpretation." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal.4th 1, 18–19 (1995) (internal citations omitted); *see also* Cal. Civ. Code § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.").

The policy explicitly defines "claim" to mean "a written demand made by or on behalf of a Claimant alleging damages[.]" California courts define "demand" as "a request for something under an assertion of right or an insistence on some course of action." *Westrec Marina Mgmt., Inc. v. Arrowood Indem. Co.*, 163 Cal. App. 4th 1387, 1392 (2008) (citing Webster's 3d New Int'l Dict. (2002)). Black's Law Dictionary (12th ed. 2024) similarly defines "demand" as "[t]he assertion of a legal or procedural right." California courts have relied on Black's Law Dictionary when interpreting undefined contract terms. *See, e.g.*, *Hybrid Fin. Ltd. v. Hammit, Inc.*, 2024 WL 2334481, at *2 (C.D. Cal. Apr. 17, 2024). In *AIU Insurance Co. v. Superior Court*, 51 Cal. 3d 807, 826 (1990), the California Supreme Court quoted the Black's Law Dictionary definition of damages, among other definitions. Today, Black's defines "damages" as "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury." Black's Law Dictionary (12th ed. 2024). And as the Court explained in *AIU Insurance*, California courts define "damages" as "money" that is "recovered by a party for loss or detriment it has suffered." 51 Cal. 3d at 826 (collecting definitions); *see also Jaffe v. Cranford Ins. Co*, 168 Cal. App. 3d 930, 935 (1985) ("'Damages' describes a payment made to compensate a party for injuries suffered."). ).

Thus, to qualify as a "claim" under the terms of the policy, a communication must be a written assertion of a legal right to money as compensation for loss or injury.

There is no dispute that the Wilshire Letter was a written communication and was sent on behalf of the former employee (the potential "Claimant"). The letter directs the Insureds to notify

its insurance company of this "claim." It threatens to "take such steps as are necessary to protect the legal interests of our client" counsel for the claimant "does not receive a response from the you or your insurance carrier within ten (10) days." It demands disclosure of the Insured's policy limits and specifies how payments are to be made – with counsel listed as co-payee.

HCC argues that this is sufficient to find that the letter makes a demand for damages because "[t]he only reason for the involvement of an insurer is to seek financial recovery in the form of compensatory damages." Reply at 8. The Insureds counter that a "demand" must be express, not implied, and that any allegation of damages must explicitly refer to a legal right to compensation for loss or injury. Opp'n at 13–15. HCC contends, on the other hand, that a clear implicit demand for monetary compensation for violation of rights is sufficient to constitute a claim.

Under California courts' interpretation of "claim," HCC has the better argument. California law does not recognize "a request for an explanation, the expression of dissatisfaction or disappointment, mere complaining, or the lodging of a grievance" as a claim. *Abifadel v. Cigna Ins. Co.*, 8 Cal. App. 4th 145, 160 (1992). But the Wilshire Letter is more than that. It is a "formal request" for disclosure of insurance policy limits and a notification that the former employee's counsel will "take . . . steps . . . to protect the legal interests of [their] client" if insurance information is not provided. The fact that the letter does not specify the amount of compensation sought is not dispositive. A "claim" need not include a demand for a specific amount of money or even a specific demand for payment to the claimant. *Catlin Specialty Ins. Co. v. CAMICO Mut. Ins. Co.*, 896 F. Supp. 808, 820 (N.D. Cal. 2012) (holding that a letter expressing an expectation that an insurance company fund a judgment if that judgment was affirmed was a "claim").

The policy's definition of a "claim" is satisfied here. A demand for monetary compensation for violation of the claimant's legal rights is clearly implicit in the Wilshire Firm's letter. There is no other possible reason for the letter to direct the Insureds to notify their carrier of the "claim," to demand insurance policy limits, to threaten to take action necessary to protect the "legal interests" of the client, and to specify how payment is to be made. The Wilshire Firm sent

United States District Court
Northern District of California

the letter in order to recover monetary compensation for their client's loss or injury resulting from an identified incident.

The Wilshire Letter is, in some ways, similar to a letter held to be a "claim" in *Westrec Marina Management, Inc. v. Arrowood Indemnity Co.*, 163 Cal. App. 4th 1387 (2008). In that case, an insurance policy defined "claim" as "a written demand for civil damages or other relief." *Id.* at 1389. Westrec received a letter from the attorney of a former employee, which stated:

> I am writing to you to see if Westrec would prefer to attempt to resolve or mediate this matter, or if it will be necessary to file a lawsuit and have a jury decide the outcome. It is often in an employer's best interests to resolve discrimination claims promptly in order to avoid paying statutory attorney's fees which must be awarded by the court should the employee prevail. Those fees alone can exceed $200,000 by the time of trial. . . . Before any litigation becomes necessary, however, I believe the Company should first be permitted to do the right thing to promptly rectify the harm caused to [employee] in a confidential and discreet manner. If this matter were to be resolved in this manner, there is a second advantage to the Company — one can almost be assured that a prompt resolution will be far less expensive and less time consuming for the Company and its executives.

The letter concluded, "I look forward to hearing back from you or your legal counsel." *Id.* at 1390.

The court held that the letter was a claim because it expressed the former employee's intent to sue Westrec if a settlement could not be reached. *Id.* at 1392. Although the letter did not expressly demand money damages, the court "construe[d] the letter as a settlement demand seeking monetary compensation" for alleged wrongdoing. *Id.* at 1393. The court reasoned that the "insistence on compensation . . . in lieu of litigation constituted a demand for 'civil damages or other relief' within the ordinary meaning of those words." *Id.*

Here, too, the Wilshire Letter makes clear that the Insureds' former employee demanded insurance information from the Insureds, obviously for purposes of obtaining monetary compensation. To be sure, the implicit demand for compensation was perhaps even more clear in *Westrec*. The reference to potential attorney fees liability and the potential necessity of litigation which could be obviated by the Company "doing the right thing" left no doubt what the letter was demanding – compensation to avoid a lawsuit. But both here and in *Westrec*, even though there

was no specific demand for payment, and no demand for payment in any fixed amount, the implication was clear: the letter demanded payment of monetary compensation for an alleged violation of rights.

It is true that the letter in *Westrec* described the alleged incidents of discrimination and wrongful termination. Here, the Wilshire Letter merely refers to an "accident" and does not describe the alleged wrongful conduct. But the Insureds knew what the letter referred to. The letter had the name of the employee and the date and place of the incident, and the Insureds had been informed of the underlying allegations and had conducted their own internal investigation by the time they received the letter. That the letter does not explicitly describe the alleged wrongdoing does not negate its demand for compensation; the subject incident was known.[3]

The Insureds argue that *Westrec* is distinguishable because there, the policy defined "claim" as a demand for "civil damages or other relief." The Insureds say that the offer of settlement in *Westrec* was "another form of relief" and that the Wilshire Letter similarly requests a type of relief *other* than damages. Opp'n at 18. But as explained above, "damages" simply means money claimed as compensation based on an asserted right. The letter was a demand for monetary compensation, so it was a demand for damages.

**B. The Objectively Reasonable Expectations of the Insured**

Even if the policy's definition of "claim" were ambiguous so as to raise a serious question whether the Wilshire Letter constituted such a "claim," under the EPL policy, rules of construction would resolve the issue in HHC's favor. If there is ambiguity in how an insurance policy applies to the facts of a case, "it is resolved by interpreting the ambiguous provisions in the sense the promisor (i.e., the insurer) believed the promisee understood them at the time of formation." *AIU Ins. Co.*, 51 Cal. 3d at 822 (citing Cal. Civ. Code § 1649). Courts assess whether a particular interpretation of the policy would be "consistent with the insured's *objectively reasonable*

[3] It is also true that, in *Westrec*, the former employee had obtained a right-to-sue letter from the Department of Fair Employment and Housing before the demand letter was sent (whereas here the right-to-sue letter was not obtained until after the Wilshire letter was sent). 163 Cal. App. 4th at 1390. But while the fact that the former employee in *Westrec* already had a right-to-sue letter may have given special force to her threat to sue, that was not the driving force behind the court's finding of a claim.

*expectations*." *Nissel v. Certain Underwriters at Lloyd's of London*, 62 Cal. App. 4th 1103, 1111 (1998) (citing *Cooper Cos. v. Transcon. Ins. Co.*, 31 Cal. App. 4th 1094, 1106 (1995)). This requires "a consideration of the policy as a whole, the circumstances of the case in which the claim arises and 'common sense.'" *Nissel* at 1112 (quoting *Bank of the West v. Superior Ct.*, 2 Cal. 4th 1254, 1276 (1992)). The question "must be answered through the eyes of a reasonable person in the position of the insured." *St. Paul Fire & Marine Ins. Co. v. Am. Dynasty Surplus Lines Ins. Co.*, 101 Cal. App. 4th 1038, 1056 (2002) (citing *Montrose Chem. Corp. v. Admiral Ins. Co.* 10 Cal. 4th 645, 666–67 (1995)).

Here, the policy as a whole and the circumstances of the case indicate that a reasonable person in the position of the Insureds would understand the letter to be claim that they needed to report timely to Defendant. The policy provides a separate definition of "circumstance," which is "any fact or event that may give rise to a Claim . . . against one or more Insureds, which is first discovered or learned by an Insured during the Policy Period, but which does not yet meet the definition of a Claim." Given the undisputed facts of this case, the Insureds would have reasonably understood the initial allegations of sexual harassment by the former employee to be such a "circumstance." Though the Insureds were made aware of the allegation and thus a "circumstance" under the policy, initially no claim had been made; the Insureds had not received any demand. However, when the Wilshire Letter made clear that the former employee was seeking compensation for the alleged wrongdoing, given the information already in hand, any person in the position of the Insureds would or should have known that the "circumstance" had now been converted into a "claim" under the EPL policy.

Notably, the Insureds in fact understood the Wilshire Letter as a claim for purposes of their policies with PMIC and MAIC. The Insureds notified those insurers upon receiving the letter. While we must resolve ambiguity under an objective test of what the reasonable person in the place of the Insureds would have understood, the fact that the Insureds understood the letter to be a claim for their other policies is strong evidence suggesting it would be reasonable for someone in the Insured's place to understand the letter as a "claim" under HCC's policy as well. The point of the claims-made policy language at issue is to give timely notice to the Insured when it is evident

there is a claim for damages for which the insurer might be responsible under the policy, and the Insured presumably understood that.

Thus, even if the definition of "claim" were ambiguous in its application to the Wilshire Letter, it would be objectively reasonable for an insured to understand, given the circumstances, that the letter was a claim that was required to be reported to Defendant under the claims-made policy. In other words, it is the kind of understanding which HCC would have believed (at the time the claims-made EPL policy was issued) the Insured would have. *AIU Ins. Co.*, 51 Cal. 3d at 822. And treating the Wilshire Letter as a "claim" is "consistent with the insured's objectively reasonable expectations." *Nissel*, 62 Cal. App. 4th at 1111.

## V. CONCLUSION

In sum, under the text of the EPL claims-made policy, the Wilshire Letter constituted a "claim" within the meaning of the policy. Even if the policy's definition of "claim" were deemed ambiguous as applied to the facts of this case, the Insured had a reasonably objective expectation that it would be so construed. For the foregoing reasons, the Court **GRANTS** Defendant Houston Casualty Company's Motion to Dismiss.

**IT IS SO ORDERED**.

Dated: October 7, 2026

EDWARD M. CHEN
United States District Judge